Filed 6/18/26  P. v. Burkhart CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

|  |  |
|---|---|
| THE PEOPLE, | B344289 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA425399) |
| v. | |
| HARRY BURKHART, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, George G. Lomeli, Judge.  Affirmed.

Richard B. Lennon, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles G. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Kenneth C. Byrne, Supervising Deputy Attorney General, and Ana R. Duarte, Deputy Attorney General, for Plaintiff and Respondent.

_____

Harry Burkhart appeals from a judgment of conviction entered after a jury found him guilty of multiple counts of arson and related offenses.  After a bifurcated trial on Burkhart's sanity, the jury found Burkhart was sane when he set the fires.  Burkhart's sole contention on appeal is that substantial evidence does not support the trial court's finding that he was not eligible for mental health diversion under Penal Code section 1001.36.[1]  Burkhart argues that under the amended standard that took effect in 2024, the prosecution did not rebut the presumption under section 1001.36, subdivision (b)(2), that Burkhart's mental disorder was a significant factor in the commission of the offenses.  Burkhart further argues the court erred in finding that his borderline personality disorder was not a qualifying disorder under the statute.

Burkhart is correct that by the time of the hearing on mental health diversion, most personality disorders, including borderline personality disorder, were qualifying disorders under the statute.  However, the trial court did not base its finding that Burkhart was ineligible for mental health diversion on the fact he did not have a qualifying mental disorder.  Rather, the court relied on expert opinions that, although Burkhart suffered from multiple mental disorders, there was clear and convincing evidence his mental disorders were not motivating, causal, or contributing factors to his commission of the offenses.  Rather, Burkhart committed the arsons to seek revenge against the

---

[1]     All further undesignated statutory references are to the Penal Code.

2

United States government for arresting and extraditing his mother to Germany.  We affirm.[2]

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Offenses and Convictions*

From the early morning of December 30, 2011 until his arrest in the early morning of January 2, 2012, Burkhart lit a series of more than 40 fires.  Burkhart started each fire by placing a fire starter on top of a fire log, which he positioned beneath the engine compartment of an automobile, usually one parked in a carport.  Many of the fires spread to surrounding structures, including some residences.  Burkhart typically lit clusters of fires by setting logs aflame beneath multiple parked cars in a particular location, then traveling to another area to do the same.

On December 28, 2011, prior to Burkhart setting the first fire, his mother, Dorothee,[3] was arrested at the request of the German government to extradite her to Germany on pending criminal charges.  That evening Burkhart purchased fire starters from a grocery store.  The next day, Burkhart attended a hearing in a federal courthouse on Dorothee's extradition.  During the hearing, Burkhart shouted out, "Fuck all Americans."  He was

---

[2]    Burkhart also contends substantial evidence does not support the trial court's finding he was not suitable for diversion because he posed an unreasonable risk of danger.  Because we affirm the court's finding that Burkhart was not eligible for mental health diversion, we do not reach this issue.

[3]    We refer to Burkhart's mother as Dorothee to avoid confusion because they share a last name.

escorted out of the courtroom by security officers, and in response to their inquiries he stated, "Fuck You.  Fuck America.  Fuck all Americans."

Burkhart lit the first fire at around 1:00 in the morning following the extradition hearing (December 30).  That day Burkhart set more than 30 fires.  At trial the prosecutor played a taped telephone conversation between Burkhart and his mother that took place on January 1, 2012, while Dorothee was in jail awaiting extradition.  In the call Dorothee told Burkhart to stay calm, and he responded, "Roast America.  I cannot remain calm." When Dorothee again encouraged Burkhart to calm down, he responded, "What can I do?  Roast America?  Yes, roast Germany, as well.  Yes, roast Germany."  The following day Burkhart started more than 10 additional fires.

Burkhart pleaded not guilty and not guilty by reason of insanity.  During the guilt stage of the trial, the jury found Burkhart guilty of 18 counts of arson of an inhabited structure, 25 counts of arson of property, two counts of arson of a structure, two counts of attempted arson, and two counts of possession of flammable material.

During the sanity stage of the trial, forensic psychologist Dr. Richard Romanoff testified for the defense and opined Burkhart suffered from autism spectrum disorder, impaired cognitive function, paranoid delusions, and stress-related psychotic mental illness, which rendered Burkhart legally insane when he set the fires.  Dr. Romanoff also noted that Burkhart was diagnosed with schizophrenia a few months before setting the fires.  He opined Dorothee had an unspecified mental illness that caused her to have "paranoid delusional beliefs" that she had been "feeding" to Burkhart since he was a child.  As a result of

4

his mother's delusions and his autism spectrum disorder, Burkhart had difficulty distinguishing between what was real and what was not. Dr. Romanoff opined that Burkhart had "some evidence of goal-directed behavior that reflects thinking, decision-making that's rational, and . . . some evidence of irrational [thought] . . . that goes along with, you know, the paranoid thought process he had."

Forensic psychologist Dr. Kris Mohandie testified for the prosecution. Dr. Mohandie also diagnosed Burkhart with mild autism spectrum disorder, but he opined it did not interfere with Burkhart's ability to recognize right from wrong or to engage in highly organized, purposeful criminal behavior and to know what he was doing. Dr. Mohandie also opined that Burkhart had a personality disorder, which led to his strong hatred of the United States. Further, he was malingering and making up the severity of his mental illness to avoid blame for his crimes. Dr. Mohandie acknowledged that Burkhart had a history of psychotic symptoms, which may have been due to his borderline personality, but Dr. Mohandie did not see any evidence of psychotic thinking at the time Burkhart was committing the crimes. Burkhart's first sanity trial ended in a mistrial because the jurors were unable to reach a unanimous decision.

At Burkhart's second sanity trial, Dr. Romanoff testified for the defense and again opined Burkhart suffered from autism spectrum disorder and paranoia as a direct consequence of the information shared by Dorothee with respect to her perception of the world; Burkhart had a very unhealthy relationship with his mother. Further, there was evidence he was legally insane when he set the fires. Dr. Joseph Ortego, the chief psychiatrist at the jail where Burkhart was confined during trial, testified that

5

Burkhart exhibited paranoid behavior when he was first taken to the jail.  Dr. Ortego added that while Burkhart was in custody, he stated he was angry at America because they arrested his mother to extradite her.

Forensic psychologist Dr. Joel Leifer testified for the prosecution.  Dr. Leifer opined that at the time Burkhart set the fires, he was not suffering from autism spectrum disorder or any other mental illness.  Rather, Burkhart committed the crimes out of revenge for his mother's arrest and extradition.

At the conclusion of the second sanity trial, the jury found Burkhart was sane when he set the fires.  The trial court sentenced Burkhart to an aggregate state prison term of 33 years four months.  Burkhart timely appealed.

B. *Burkhart's First Appeal and Motion for Mental Health Diversion*

On appeal, we rejected Burkhart's contention that his trial counsel conceded Burkhart's guilt in violation of Burkhart's Sixth Amendment right to counsel.  However, since Burkhart's sentencing in 2018, the Legislature enacted sections 1001.35 and 1001.36 as part of Assembly Bill No. 810 (2017-2018 Reg. Sess.), effective June 27, 2018, which provided trial courts discretion to grant pretrial diversion for individuals suffering from certain mental health disorders.  We conditionally reversed and directed the trial court to determine whether Burkhart qualified for mental health diversion pursuant to section 1001.36.  (*People v. Burkhart* (Aug. 19, 2020, B289069) [nonpub. opn.].)

On remand, the trial court conducted a mental health diversion eligibility hearing and found Burkhart was not eligible for mental health diversion under section 1001.36,

6

subdivision (b)(1)(B), because Burkhart's mental disorder was not a significant factor in the commission of the offenses. In reaching its conclusion, the court considered the testimony from the three experts who had testified at the sanity phase of the trial, as well as the evidence presented at trial that Burkhart's "criminal conduct was motivated by retribution for his mother's extradition from the United States."

The trial court acknowledged that Dr. Romanoff "testified [Burkhart] suffered from autism and a schizophrenic disorder." Further, Burkhart argued in his brief that his anger over his mother's extradition was "'intensified' by his mental disorder and played a significant role in his criminal conduct." However, the court characterized Burkhart's contention as "nothing more than a conclusory statement when considered with the overall voluminous evidence presented in the trial proceedings by the various doctors." After hearing argument from Burkhart's counsel, the court denied Burkhart's request for diversion, explaining, "[T]he court did consider this case very carefully, and it was a tedious review of the record and the testimony rendered by the various doctors that the court referenced . . . but, in the end, I don't find that his . . . mental disorder played a significant role in the commission of the charged offenses and/or substantially contributed to the conduct he'd engaged in, the various arson offenses . . . ." The court reinstated Burkhart's convictions and sentence (with the exception of fines and assessments).

Burkhart again appealed.

C.    *Burkhart's Second Appeal*

On September 29, 2022, while Burkhart's second appeal was pending, the Legislature amended section 1001.36, effective January 1, 2023.  (See Sen. Bill No. 1223 (2021-2022 Reg. Sess.) (Stats. 2022, ch. 735, § 1) (Senate Bill 1223).)  Amended section 1001.36, subdivision (b)(2), modified the standard for eligibility for mental health diversion by creating a presumption that the defendant's mental disorder was a significant factor in the commission of the offense:  "If the defendant has been diagnosed with a mental disorder, the court shall find that the defendant's mental disorder was a significant factor in the commission of the offense unless there is clear and convincing evidence that it was not a motivating factor, causal factor, or contributing factor to the defendant's involvement in the alleged offense."

In his second appeal, we agreed with the parties that amended section 1001.36 applied retroactively to Burkhart's prosecution under *People v. Frahs* (2020) 9 Cal.5th 618, 624 and *In re Estrada* (1965) 63 Cal.2d 740, 744-745.  (*People v. Burkhart* (Dec. 13, 2022, B311443) [nonpub. opn.].)  We conditionally reversed Burkhart's judgment of conviction and directed the trial court to determine whether Burkhart qualified for diversion under the standard set forth in amended section 1001.36.

D.    *Proceedings on Remand*

On remand, Burkhart filed an updated report from Dr. Romanoff and a proposed treatment plan for Burkhart submitted by a German clinic.[4]  In response, the prosecution filed

---

[4]    On August 7, 2025 Burkhart filed a motion to augment the record with the trial transcript filed in his first appeal, case

a renewed opposition to Burkhart's motion for mental health diversion and an updated report from Dr. Leifer.

Dr. Romanoff stated in his updated report that he had interviewed Burkhart multiple times in 2012 and most recently in November 2023.  He opined that there was "clear evidence" that Burkhart had autism spectrum disorder, which made the abrupt extradition of his mother difficult, especially given his close relationship with her.  Dr. Romanoff also diagnosed Burkhart with schizoaffective disorder and noted that Burkhart had been diagnosed with schizophrenia and bipolar disorder. Further, autism spectrum disorder and schizoaffective disorder were qualifying mental disorders under section 1001.36.  He also found that Burkhart's mental disorder was a significant factor leading to his commission of the charged offenses.

In his updated report, Dr. Leifer opined, as he did in his earlier testimony, that Burkhart was diagnosed with autism spectrum disorder, but he "evidenced the capacity to communicate and interact meaningfully" and had "engaged in highly organized, purpose-driven behaviors."  Further, Burkhart

---

No. B289069, and three documents filed in the trial court with respect to the February 13, 2025 hearing on mental health diversion:  (1) March 15, 2024 updated report from Dr. Romanoff; (2) February 8, 2024 treatment plan submitted by Burkhart from the Limes-Schloss Clinic in Germany, translated into English; and (3) People's opposition to Burkhart's motion for mental health diversion, which attached an October 26, 2024 updated report from Dr. Leifer.  The documents were filed in the trial court and relied on by the court.  In addition, Burkhart and the Attorney General cite to the documents in their appellate briefs. We grant the motion.  (Cal. Rules of Court, rule 8.155(a)(1)(A).)

"was not consistently experiencing psychiatric disturbances" and "was not consistently an agitated, oppositional, dysfunctional individual." He also opined that Burkhart suffered from a "longstanding, complex personality disorder," citing the reports and testimony from Drs. Mohandie and Romanoff. But Dr. Leifer observed that although Burkhart's diagnosis with dependent personality disorder satisfied the specifications in the current version of the Diagnostic and Statistical Manual of Mental Disorders (DSM), the disorder was not a qualifying mental disorder under section 1001.36.

Dr. Leifer also opined that Burkhart's claims of persecution were not symptoms of a psychotic disorder, but rather, his adoption of his mother's delusional beliefs. In reaching this conclusion he cited Dr. Romanoff's testimony at the sanity trial, in which Dr. Romanoff testified that Burkhart "has a paranoid view of the world that is not best thought of as a delusion, but as a pervasive way of the viewing the world . . . . He lives in a fantasy world . . . that's been fueled by an unhealthy interaction with his mother," and Burkhart's purported delusions reflected a "shared paranoid view of the world that includes information that, if accepted at face value, would be labeled delusional," but actually was a product of the persecutorial mindset imparted to him by his mother. (Italics omitted.)

Dr. Leifer concluded that Burkhart's "severe mental disorder did not play a contributory role in his charged offenses." In reaching that conclusion, Dr. Leifer pointed to Burkhart's stated hatred of the United States after learning of his mother's arrest and extradition and the multiple threats he made to "roast America" during conversations with his mother. Further, during the surveillance videos of Burkhart shopping for incendiary

10

devices (just two hours after learning his mother was going to be extradited), Burkhart did not display any "bizarre or inappropriate behaviors," and he was able successfully to execute a strategy to build more than 40 incendiary devices that, once ignited, would give him time to leave the crime scene undetected.

Dr. Leifer also noted that a video of Burkhart setting a fire at the German Consulate did not show any "chaotic, compulsive, psychotic and /or disorganized behaviors." In addition, when he was arrested and subsequently detained, Burkhart behaved appropriately, without any suicidal, rageful, depressed, anxious, psychotic, irrational, or violent behavior, and he complied with police instructions without incident. Likewise, during his videotaped police interviews, Burkhart explained that he had committed the arsons because of his anger with the American government for incarcerating his mother, and he did not evidence any symptoms of a disabling mental illness.

Finally, Dr. Leifer opined that Burkhart would pose a substantial danger of harm to public safety if he were treated in the community.

On February 13, 2025 the trial court held a hearing on Burkhart's motion for mental health diversion. At the outset of the hearing, the court observed that, as amended, "[s]ection 1001.36 creates a presumption that a given defendant's mental disorder was a significant factor in the commission of a given offense, and thus the court shall find that the mental disorder was a significant factor in the commission of said offense, [but] it is also clear that the statute provides that said presumption may be refuted where there is 'clear and convincing evidence' that it was not a motivating factor, causal factor, or

11

contributing factor to the defendant's involvement in the offense in question."

The trial court indicated it had considered the trial record, including the testimony at the guilt and sanity phase of the trials, the expert reports presented by the prosecution and defense, the jail calls between Burkhart and his mother, and the updated reports from Drs. Romanoff and Leifer. Further, the court noted it had presided over the trial and heard the testimony provided by Drs. Leifer, Ortego, and Romanoff.

The trial court highlighted that Dr. Romanoff acknowledged in his updated report that when he evaluated Burkhart in 2012, he reviewed Burkhart's entire medical history, but given that this was an "extremely unusual case[,] . . . efforts to accurately reconstruct Mr. Burkhart's mental state during the period of time when he committed the offenses [were] difficult to pursue." Further, given his inability to obtain meaningful information from Burkhart, Dr. Romanoff was "'unable to definitively reconstruct his actual thoughts and feelings as he engaged in them.'" Nonetheless, in his 2024 report Dr. Romanoff opined that Burkhart's mental issues played a significant role in his criminal conduct.

At this point the court stated: "It should be noted that under [section 1001.36], neither conditions such as antisocial personality disorder nor borderline personality disorder qualify as viable mental disorders as envisioned by the statute as qualifying disorders."

The trial court then stated its finding based on all the evidence that there was "clear and convincing evidence that *any mental disorder* on the part of the defendant was not 'a motivating factor, causal factor, and/or contributing factor' in the

commission of the numerous arson offenses" on which Burkhart was convicted.  (Italics added.)  The court continued, "To the contrary, from the overall trial evidence, the defendant's criminal conduct was motivated by retribution for his mother's arrest and ultimate extradition from the United States."

The trial court observed that Dr. Leifer testified Burkhart "was aware of his conduct," and the "manner and technique" Burkhart used to set the fires did not show Burkhart "had a low functioning mentality."  Further, the doctors agreed that Burkhart had a strong bond with his mother.  Dr. Ortego testified he "did not feel that the defendant suffered from a mental disease or defect *at the time of the crimes*, but rather that his criminal conduct was motivated by revenge for his mother's extradition."  (Italics added.)  In addition, Dr. Leifer testified that Burkhart's mother influenced Burkhart and caused him to malinger and, as the jail calls reflected, Burkhart's mother influenced how Burkhart presented to Dr. Romanoff.  Dr. Leifer gave as an example that Burkhart's mother instructed him on how he should feign confusion.

The trial court also relied on Dr. Leifer's conclusion that Burkhart had the capacity for high-level cognitive reasoning, as evidenced during his multiple arsons.  Thus, his disorders "were not severe enough to impair his capacity for comprehending complex issues . . . or impair his ability to plan and to execute his arson charges."  The court reiterated its finding that there was clear and convincing evidence that Burkhart's "mental disorders were not a motivating factor, causal factor, or contributing factor to the defendant's involvement in the arson offenses.  On the contrary, it was the arrest and ultimate extradition of his mother that was the exclusive reason behind his arson offenses."

13

Finally, the trial court cited Dr. Leifer's opinion that Burkhart's actions in committing the offenses showed he continued to pose a serious danger to public safety. On this basis the court stated as an additional ground for denying mental health diversion that Burkhart was not suitable for treatment in the community. The court concluded Burkhart was not eligible for mental health diversion.

## DISCUSSION

A. *Governing Law and Standard of Review*

Section 1001.36 gives trial courts the discretion to grant pretrial diversion for individuals suffering from certain mental health disorders. (*Frahs, supra*, 9 Cal.5th at p. 626; *People v. Whitmill* (2022) 86 Cal.App.5th 1138, 1147-1148 (*Whitmill*).) Under pretrial diversion, the trial court may postpone prosecution at any time in the judicial process, either temporarily or permanently, to allow the defendant to undergo mental health treatment. (*Frahs*, at p. 626; *Vaughn v. Superior Court* (2024) 105 Cal.App.5th 124, 133 (*Vaughn*); *Whitmill*, at p. 1148.) "The Legislature intended the mental health diversion program to apply as broadly as possible." (*Whitmill*, at p. 1149; see *Frahs*, at p. 632.)

Under section 1001.36, a defendant must be both eligible and suitable for mental health diversion. A defendant is eligible under section 1001.36, subdivision (b), if (1) the defendant has been diagnosed by a qualified mental health expert with a mental disorder as identified in the most recent edition of the DSM, "excluding antisocial personality disorder and pedophilia"; and (2) the defendant's mental disorder was a significant factor in the commission of the charged offense. (See *People v. Tourville*

14

(2026) 120 Cal.App. 5th 439, 451-452 (*Tourville*); *Vaughn, supra*, 105 Cal.App.5th at p. 133.)

With respect to the second eligibility requirement that the defendant's mental disorder must have been "a significant factor in the commission of the charged offense," section 1001.36, subdivision (b)(2), provides:  "If the defendant has been diagnosed with a mental disorder, the court shall find that the defendant's mental disorder was a significant factor in the commission of the offense unless there is clear and convincing evidence that it was not a motivating factor, causal factor, or contributing factor to the defendant's involvement in the alleged offense.  A court may consider any relevant and credible evidence, including, but not limited to, police reports, preliminary hearing transcripts, witness statements, statements by the defendant's mental health treatment provider, medical records, records or reports by qualified medical experts, or evidence that the defendant displayed symptoms consistent with the relevant mental disorder at or near the time of the offense."

The statute specifies four factors that must be met for a defendant to be suitable for diversion: (1) in the opinion of a qualified mental health expert the defendant's mental disorder would respond to treatment; (2) the defendant consents to diversion and agrees to waive his or her speedy trial rights; (3) the defendant agrees to comply with treatment requirements; and (4) if treated in the community, the defendant will not pose an "unreasonable risk of danger to public safety" as defined in section 1170.18.  (§ 1001.36, subd. (c)(1)-(4); *Tourville, supra*, 120 Cal.App. 5th at p. 452.)  Section 1001.36, subdivision (e), places the burden on the defendant "to make a prima facie showing that the defendant will meet the minimum requirements

15

of eligibility for diversion and that the defendant and the offense are suitable for diversion." (*See Vaughn, supra*, 105 Cal.App.5th at p. 134.)

"An unreasonable risk of danger to public safety as defined in section 1170.18, subdivision (c), means '"an unreasonable risk that the [defendant] will commit a new violent felony"' within the meaning of section 667, subdivision (e)(2)(C)(iv), which felonies are 'colloquially referred to as "super strikes."' [Citation.] 'Those super strikes are murder, attempted murder, solicitation to commit murder, assault with a machine gun on a police officer, possession of a weapon of mass destruction, any serious or violent felony punishable by death or life imprisonment, or any sexually violent offenses or sexual offense committed against minors under the age of 14.'" (*Gomez v. Superior Court* (2025) 113 Cal.App.5th 671, 679; accord, *Tourville, supra*, 120 Cal.App.5th at p. 452.)[5]

Even if a defendant meets all the statutory eligibility and suitability criteria, the trial court still has discretion to deny diversion. (*People v. Cabalar* (2025) 117 Cal.App.5th 41, 53; *Vaughn, supra*, 105 Cal.App.5th at p. 134.)

We review the trial court's decision to grant or deny a motion for mental health diversion for abuse of discretion. (*Vaughn, supra*, 105 Cal.App.5th at p. 135; *Whitmill, supra*, 86 Cal.App.5th at p. 1147.) A court abuses its discretion when it

---

[5] In addition, under section 1001.36, subdivision (d), defendants are not eligible for mental health diversion if they are charged with murder, voluntary manslaughter, an offense requiring sex offender registration (except for indecent exposure), specified sex offenses, or offenses involving weapons of mass destruction.

makes an arbitrary decision by applying the wrong legal standard or bases its decision on express or implied factual findings that are not supported by substantial evidence. (*Vaughn*, at p. 135; *Whitmill*, at p. 1147.) A court also abuses its discretion "when its decision exceeds the bounds of reason or is so irrational or arbitrary that no reasonable person could agree with it." (*People v. Oneal* (2021) 64 Cal.App.5th 581, 588.)

We review the trial court's finding whether the defendant's mental disorder was a significant factor in the commission of the charged offense for substantial evidence. (*People v. Gerson* (2022) 80 Cal.App.5th 1067, 1079; *People v. Oneal, supra*, 64 Cal.App.5th at p. 589 [noting § 1001.36, subd. (b)(1), "requires the court to review 'relevant and credible evidence,'" which is a "quintessential factfinding process"].) Because the prosecution must show by clear and convincing evidence that a mental disorder was not a significant factor, we determine "whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995-996; accord, *Gomez v. Superior Court, supra*, 113 Cal.App.5th at p. 688.) We also "must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.*, at p. 996; accord, *Gomez*, at p. 688.)

B.     *Substantial Evidence Supports the Trial Court's Ruling*
Burkhart contends the trial court abused its discretion in finding Burkhart's mental disorders were not motivating, causal,

or contributing factors to his commission of the arsons because the court mistakenly assumed that Burkhart's borderline personality disorder was not a qualifying mental disorder under the mental health diversion statute. Burkhart is correct that both Dr. Leifer and the court (at the February 2025 hearing) incorrectly believed that borderline personality disorder was not a qualifying offense for purposes of mental health diversion. Prior to 2024, all personality disorders were excluded from the list of qualifying mental disorders, but following the passage of Assembly Bill No. 1412 (2023-2024 Reg. Sess.), section 1001.36, subdivision (b)(1), was amended, effective January 1, 2024, to include all mental disorders identified in the DSM except for antisocial personality disorder and pedophilia. (Stats. 2023, ch. 687, §§ 1.1, 1.2.)

Contrary to Burkhart's contention, however, the trial court did not base its finding that Burkhart's mental disorders were not contributing factors to his commission of the arsons on a mistaken belief that his personality disorder was not a qualifying mental disorder. Rather, the court considered extensive evidence that Burkhart suffered from multiple mental disorders in addition to borderline personality disorder. As discussed, Drs. Romanoff and Leifer in their updated reports stated Burkhart had autism spectrum disorder; Dr. Romanoff opined Burkhart also suffered from schizophrenic disorder and had been diagnosed with schizophrenia and bipolar disorder. In addition, the court considered the trial testimony from Drs. Romanoff, Mohandie, Leifer, and Ortego, which included testimony that Burkhart suffered from paranoid delusions, stress-related psychotic illness, paranoia, and psychotic symptoms.

Moreover, although the trial court "noted" (mistakenly) that borderline personality disorder was not a qualifying mental disorder, the court found there was clear and convincing evidence that "any mental disorder on the part of the defendant" was not a motivating, causal, or contributing factor to Burkhart's commission of the arsons, but rather, he was motivated by his desire to seek retribution for his mother's arrest and extradition by the United States.

Substantial evidence supports the trial court's finding. It is true, as pointed out by Burkhart, that Dr. Leifer testified Burkhart suffered from features of a personality disorder that could cause psychotic symptoms. However, Dr. Leifer concluded this disorder did not play a role in Burkhart's commission of the arsons. Instead, Dr. Leifer testified that Burkhart committed his crimes solely out of revenge for his mother's arrest and extradition. Burkhart speculates that this finding was tainted by Dr. Leifer's belief that personality disorders were not qualifying disorders. But nothing in the record suggests this belief had any effect on Dr. Leifer's conclusion that Burkhart's conduct was not the result of a mental disorder. To the contrary, Dr. Leifer testified that Burkhart was not suffering from *any* mental disorder at the time he committed the arsons.

As Dr. Leifer stated in his updated report, Burkhart was able to engage in complex tasks during the course of his conduct in setting more than 40 fires. Specifically, as seen in the surveillance videos, Burkhart did not display any bizarre or inappropriate behaviors or other symptoms of mental illness while shopping for supplies, setting the fires, during his arrest and detention, and in his videotaped police interviews. Burkhart was able to build multiple incendiary devices that were ignited in

19

a manner that allowed him to set fire to 51 vehicles and to escape before his presence could be detected. And Burkhart admitted during his police interviews that he committed the offenses because of his anger over the arrest of his mother, consistent with his repeated statements during his mother's extradition hearing and taped calls with his mother just before setting the fires that he wanted to "roast America." The trial court relied heavily on Dr. Leifer's opinion in finding Burkhart had the capacity for "high-level cognitive reasoning" and that his mental disorders were not sufficiently severe to impair his ability to plan for and carry out the plan to set multiple fires.

Burkhart notes that persons who suffer from borderline personality disorder have difficulty controlling their anger, relying on Dr. Leifer's opinion in his report that Burkhart's personality disorder led him to have "inappropriate, intense anger" and difficulty controlling his anger. But Dr. Leifer still concluded that Burkhart ignited the fires as revenge for his mother's arrest and extradition. Dr. Leifer pointed to Burkhart's lack of psychotic symptoms at the time he set the fires, and the nature of his decision-making and complex thinking in carrying out over 40 fires without detection.

Accordingly, reviewing the record as a whole, with deference to the trial court's evaluation of the evidence and credibility of the expert witnesses, substantial evidence supports the court's finding by clear and convincing evidence that Burkhart's mental disorders were not motivating, causal, or contributing factors to Burkhart's commission of the arsons. (See *Conservatorship of O.B., supra*, 9 Cal.5th at pp. 995-996.) Thus, the court did not abuse its discretion in denying Burkhart's motion for mental health diversion.

## DISPOSITION

The convictions are affirmed.


FEUER, J.

We concur:


MARTINEZ, P. J.


STONE, J.